[Civ. No. 1783.   Third Appellate District.—March 29, 1918.]

## MARGARET LONG, Respondent, v. JOHN BREUNER COMPANY (a Corporation), Appellant.

NEGLIGENCE—FALL ON INCLINED ENTRANCE TO STORE—MAINTENANCE AT STEEP GRADE—QUESTION FOR JURY.—In an action for damages for personal injuries sustained by a customer by slipping and falling upon an incline in front of the entrance to the store of the defendant, based upon the alleged negligence of the defendant in maintaining such incline at a grade of from thirty-five to fifty per cent, which the evidence showed was from five to ten times in excess of the maximum grade established by custom for entrances to buildings, and sixteen times greater than the usual grade, it was for the jury to say whether defendant was negligent, and a motion for a nonsuit was properly denied.

ID.—ENTRANCES TO STORES—DUTY OF PROPRIETORS.—It is the duty of a corporation conducting a merchandise store, which it invites the public to patronize, to keep the entrances and passageways to and from the premises in a safe condition and to use ordinary care to avoid accidents to patrons.

ID.—DUTY OF CUSTOMERS.—It is the duty of customers of a store in passing over the entrance thereto to exercise ordinary care to avoid being injured by reason of an alleged defect therein.

NONSUIT—WHEN IMPROPER.—A motion for a nonsuit is not to be granted when there is any substantial evidence which, with the aid of all legitimate inferences favorable to the plaintiff, would support a verdict or finding that the material allegations of the complaint are true.

NEGLIGENCE—WHEN QUESTION OF FACT.—Negligence is a question of fact for the jury, even where there is no conflict of the evidence, if different conclusions upon the subject can be drawn from the evidence, and it is only where the evidence is such that but one conclusion with respect to negligence would be reached by a reasonable and impartial man that the question becomes one for the court.

ID.—EVIDENCE — CUSTOMARY GRADE OF ENTRANCES — TESTIMONY OF ARCHITECTS.—In an action for injuries received by a customer by slipping and falling upon an incline in front of the entrance to the

store of the defendant, testimony of architects that the usual grade of such entrances was three per cent, and that ten per cent was the greatest approved grade, is admissible, as the expression of a fact, and not the opinion of the witness.

ID.—EVIDENCE—PREVIOUS ACCIDENTS.—In an action for personal injuries sustained by a customer by slipping and falling upon an incline in front of the entrance to the store of the defendant, evidence of a witness that he had on two different occasions prior to the accident in question slipped and fallen while walking over the incline, is admissible, since such evidence tended to show the dangerous character of the place, the cause of the accident, and to bring home to defendant knowledge of the dangerous condition of the place.

ID.—SIMILARITY OF ACCIDENTS.—In order to permit the admission of testimony of previous accidents, it is not necessary that it be shown that such accidents occurred under circumstances precisely similar to those characterizing the accident in question, but it is sufficient if it be shown that they are similar in their general character.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. Peter J. Shields, Judge.

The facts are stated in the opinion of the court.

Myrick & Deering, and James Walter Scott, for Appellant.

Irving D. Gibson, E. L. Stockwell, and C. E. McLaughlin, for Respondent.

HART, J.—A jury returned a verdict in favor of plaintiff in the sum of four thousand five hundred dollars as damages sustained by her on account of injuries caused by her slipping and falling upon an incline in front of the main entrance to the store of the defendant in Sacramento. Judgment was entered for that amount, from which and from the order denying its motion for a new trial defendant appeals.

The defendant conducts a furniture store on the south side of K Street between Sixth and Seventh Streets, in said city of Sacramento. At the time of the accident to plaintiff there was a concrete incline or apron leading from the entrance to the store to the sidewalk. The grade of this incline was from nothing, where it joined the sidewalk, to thirty-five per cent, as testified by one witness, or fifty per cent, according to another, at the point where plaintiff was injured. On each side the concrete of the apron was

rounded off to meet the grade of the sidewalk. This rounded-off portion was about a foot in width and gradually diminished as it approached the edge of the curbing, and it had been chipped with a chisel to roughen the surface. There is a column at each side of the entrance, the distance between them being about twelve feet. On the easterly column two steel rods supporting an awning were affixed to it, the lower end of the rod being three and one-half feet above the sidewalk. These rods prevented one from walking within about eight and one-half inches of the post.

On October 24, 1914, the plaintiff, who was then sixty years of age and engaged as a teacher in the public schools of Sacramento, did some shopping in defendant's store. Upon leaving the store she went obliquely out of the door, turned to the east, and slipped on the rounding part of the incline, very close to the column at the east side of the entrance. There had been no rain that day and the incline was dry. The seriousness of the injuries suffered by plaintiff is not questioned by defendant.

It is first contended by appellant that its motion for a non-suit should have been granted, the grounds of the motion being that defendant was not negligent in maintaining the inclined passageway, and that plaintiff was guilty of contributory negligence in failing to look and pay attention to the passageway as she went out.

The plaintiff, testifying on direct examination, said that there was "no foreign substance" on the floor near the approach, and that she did not stumble; that she merely slipped and fell. "I could not say," she proceeded, "whether I was standing on my toes or flat on my foot. I was just walking, that is all. I slipped on the right foot, my foot nearest to the building. I had not observed the nature of the incline or approach before I slipped." She further testified that, on the occasion of the accident, she wore a pair of Oxford ties or low shoes, with low heels, which "were broader and flatter than these," referring to the shoes she was wearing when testifying.

On cross-examination she stated that she had frequently gone into the store in question through the front entrance and the entrance at which she sustained her injuries; that she could not say whether she had ever particularly noticed the slope or the nature thereof before the accident, although,

she said, at the time of the mishap she had "no present knowledge" of the slope or the approach or its character—that is to say, she was then "conscious of knowing" nothing of the slope. She said that her son had just returned to her home in ill health and that, while that fact "probably would have caused me some disturbance of my mind that day," she "was not at all out of my mind in any way. I knew what I was doing all the time. . . . I myself had been perfectly well prior to this time. I was probably walking rather rapidly at the time this happened, for I always do, or always did. I could not give any idea about how rapidly I proceeded as I left the store. I know probably I walked as I generally do, in rather a rapid manner. The skirt I wore that day was neither broad nor narrow. It was a medium width skirt —it was not wide. It was what you call a sensible skirt." She was asked whether she walked directly into the iron rod or column standing near the entrance, and whether, as she was in the act of falling, she attempted to grab the rod. She replied that she did not think so; that she was looking straight ahead. "I know," she added, "my mind is generally occupied."

It is not deemed necessary to reproduce herein in detail the testimony of the expert witnesses as to the grade or slope of the incline and as to the usual grade or slope of entrances to public buildings. It is enough to say that from the testimony of those witnesses the jury were, so far as it may be determined from the bare record before us, justified in finding, as impliedly they did find, that the incline upon which the plaintiff fell had a grade or slope of fifty per cent, or, in other words, where the plaintiff was injured, an abrupt descent of approximately one foot to each two feet of distance; that the passageway over and through which the plaintiff passed, at a point just before she reached the point at which she fell, had a grade of at least twenty-two per cent, the part having the lowest degree of steepness having a gradient of fourteen and a half per cent; that the degree of grade or slope maintained generally to entrances from sidewalks to buildings employed for business purposes is a maximum of five per cent to ten per cent, the usual grade, however, being about three per cent. Thus, as is suggested by counsel for respondent, it is clear that there was evidence from which the jury could justly have concluded, as mani-

festly they did conclude, that the grade at the point where the plaintiff fell and was injured being fifty per cent, was from five to ten times in excess of the maximum grade which it was the custom to establish, maintain, and use for entrances to public buildings and over sixteen times greater than the usual grade of such entrances, which it was testified is three per cent.

The above is a sufficient reference to the evidence to show that, without question, the case as made by the plaintiff was one which the court was required to submit to the abitrament of the jury. In other words, the evidence as to the character of the entrance, that is, as to the grade or slope thereof, was such as to make the question whether the defendant was guilty of negligence in thus maintaining it or whether the entrance as so maintained was unsafe or dangerous for the use for which it was intended and to which it was put peculiarly one for the jury's solution. And, in clear and readily understandable language the question was submitted to the jury by the trial court in its charge, wherein it correctly instructed the jury that the defendant, being engaged in conducting a merchandise store which it invited the public to patronize, the duty rested upon it to keep the entrances and passageways to and from the premises as so occupied and used by it in a safe condition, "and to use ordinary care to avoid accidents or injury to those properly and lawfully entering upon or leaving its premises through such entrances or passageways in connection with the transaction of business on such premises"; and further, that "if you find that said entrance or passageway [the entrance or passageway where the plaintiff here was injured] was in an unsafe or dangerous condition, and that such condition was the proximate cause of said injuries to plaintiff, defendant is liable therefor if its managers, officers, or agents knew of such alleged unsafe or dangerous condition, or if, as careful and prudent men, they should have known it, provided that plaintiff was in the exercise of ordinary care."

Nor can we say, on the evidence, that, as a matter of law, the plaintiff was herself guilty of negligence proximately causing or contributing to the accident and her consequent injuries. It was, of course, the duty of the plaintiff in passing over the entrance to exercise ordinary care to avoid being injured by reason of the alleged defectiveness of the passage-

way, or, as the court instructed the jury, to exercise ordinary prudence under the circumstances—that degree of care which would or should be observed under the given circumstances by the average ordinarily careful person. Whether the conduct of the plaintiff, when attempting to pass through and over the entrance, measured up to that degree of care was, in our view, a question for the jury under the proofs as adduced before them. The plaintiff declared that she started to pass through the passageway in rather a rapid walk, her usual manner of walking. She had frequently passed through the same entrance, but had never particularly noticed the character of the grade from the store to the sidewalk. While she had her mind to some extent on an invalid son, she said she was "not at all out of her mind in any way," and "knew what she was doing all the time." She further testified that it was not a wet or rainy day, that there was no "foreign substance" on the floor of the passageway, by which she meant, undoubtedly, that there was nothing thereon which would cause her to slip or stumble, and that she did not slip or strike anything which would cause her to lose her footing. Counsel for the defendant insist, however, that the plaintiff failed "to look and pay attention to the nature of the passageway as she went out from the store, thereby occasioning her downfall." There is no testimony warranting that assertion, except in so far as such an inference might be drawn from her statement that she had never particularly noticed the nature of the incline and that she left the store through the entrance at her usual rapid walking gait. But, from her statement that she was "not at all out of her mind in any way," "knew what she was doing all the time," referring to the time that she was in the act of passing over the approach, the inference is equally reasonable that she was paying attention to her steps or exercising reasonable care for her own protection when attempting to pass down the incline.

It would seem to be hardly necessary to repeat herein these well-settled propositions: 1. That a motion for a nonsuit is not to be granted when there is any substantial evidence which, with the aid of all legitimate inferences favorable to the plaintiff, would support a verdict or finding that the material allegations of the complaint are true (*Burr* v. *United Railroads*, 163 Cal. 663, 665, [126 Pac. 873]; *Kimic* v. *San*

*Jose-Los Gatos etc. Ry. Co.,* 156 Cal. 379, [104 Pac. 986];
*Archibald Estate* v. *Matteson,* 5 Cal. App. 441, [90 Pac. 723];
*Non-Refillable Bottle Co.* v. *Robertson,* 8 Cal. App. 103, [96
Pac. 324]; *Bush* v. *Wood,* 8 Cal. App. 651, [97 Pac. 709];
*O'Connor* v. *Hooper,* 102 Cal. 528, [36 Pac. 939]); 2. That
"negligence is a question of fact for the jury, even where
there is no conflict of the evidence, if different conclusions
upon the subject can be drawn from the evidence" (*Wahl-
gren* v. *Market St. Ry. Co.,* 132 Cal. 656, [62 Pac. 308, 64
Pac. 993]); 3. That "it is only where the evidence is such
that but one conclusion with respect to negligence would be
reached by a reasonable and impartial man that the question
becomes one for the court." (*Burr* v. *United Railroads,* 163
Cal. 663, [126 Pac. 873].)

Considering the testimony in view of the foregoing rules,
it is clear that the motion for a nonsuit was properly disal-
lowed upon both the grounds upon which it was predicated,
viz.: 1. That the evidence failed to show that the defendant
was guilty of negligence in the manner in which it maintained
the passageway where the plaintiff was injured; 2. That it
was the plaintiff's own negligence which directly caused or
contributed to her injuries.

After the motion for a nonsuit was denied, the defendant
introduced testimony which, naturally enough, tended to
destroy the effect of that presented in support of the com-
plaint. The effect, however, was only to create an evidential
conflict, which it was for the jury to settle.

It is next contended that the ruling whereby certain archi-
tects and building contractors, testifying as experts, were
permitted to give testimony relative to the standard or gen-
erally approved grade of approaches to public buildings was
erroneous and prejudicial. The disposal of this point will at
the same time dispose of the statement by counsel for the
defendant that the court allowed the same witnesses to tes-
tify directly to the dangerous condition of the approach in
question.

According to the testimony of the architects and building
contractors, as we have already shown, the usual or approved
grade for such slopes is three per cent, and the maximum no
greater than five to ten per cent. The importance and sig-
nificance of this testimony is obvious, since, accepting it as
showing what the customary or standard and approved grade

of the inclines to such approaches is, readily it is thus made to appear that the slope of the approach to the defendant's building, where the plaintiff was injured, was greatly in excess of what it should be to render it reasonably safe to those passing over it.   The contention is that the testimony involved mere opinions of the witnesses upon a subject not coming within the category of those upon which opinion testimony is required or allowable, and, therefore, the ruling permitting it to be received involved an invasion of the province of the jury.

But, in point of fact, the testimony referred to, while that of experts, did not involve a direct expression of the opinions of those witnesses as to the safety of the approach in question.   They were not asked, nor did they express, their opinions as to the character of the grade or the condition for safety to those using it of the approach where the plaintiff received her injuries.   They were merely asked to state as a fact—a matter within their own knowledge—what the standard or generally approved grade of approaches to public buildings is.   In reply, they stated what such grade is *as a fact* of which they had knowledge and not as their opinions of what it is.   They stated no conclusion from their own opinions respecting the ultimate issues which it was for the jury to draw.   But their testimony, it is to be admitted, was as to a matter not within common knowledge; and if we should concede that it was in the strictest sense opinion testimony, we would still be of the belief that it was not only proper, but essential, to an enlightened consideration and determination of the questions whether the defendant was negligent in the maintenance of the approach where the plaintiff was injured, and, if so, whether such negligence was the proximate cause of her injuries.   In other words, it was proper and necessary to the elucidation of other pertinent facts in issue.

Manifestly, to determine whether there was negligence in the act and fact of maintaining the approach in the condition in which it then was, the jury were required first to find whether the approach, as then maintained, was in and of itself dangerous or unsafe as a passageway to the defendant's store.   The average person, without experience in or knowledge of such matters, certainly would not know from his own knowledge or observation what the standard and approved

grade of such approaches is. Nor would he probably know, or comprehend, from a mere description of the incline or the degree of the grade thereof by others, whether it was of a degree of grade to make it a dangerous place for persons to pass over. By a comparison of what the architects and building contractors declared to be the standard or uniformly approved grade of such approaches with the grade of the approach to the defendant's store, as it was described by the witnesses who had taken measurements of it with a view of ascertaining the degree of the grade thereof, the jury could the more readily and intelligently determine whether the latter approach was safe or unsafe to pass over.

Thus it is clear that the testimony was important and relevant, and that it was competent, we make no doubt. It belongs to a class of testimony which has been uniformly sanctioned by the courts and text-writers as essential if, indeed, not well-nigh indispensable, in many instances, particularly in jury trials, to the crystallization of intelligent and just results. In "Ruling Case Law," volume 11, page 573, we find the rule with respect to opinion testimony, as deduced from the cases, of which there is an almost unlimited number, as follows: "It may be stated as a general proposition that there are two classes of cases in which expert testimony as to the facts is admissible. To the one class belong those cases in which the conclusions to be drawn by the jury depend on the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority upon the subject. If, in such cases, the jury, with all the facts before them, can form a conclusion thereon, it is their sole province to do so. In the other class we find those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts, but the conclusions to which they lead, may be testified to by qualified experts. The distinction between these two kinds of testimony is apparent. In the one instance the facts are to be stated by the experts and the conclusion is to be drawn by the jury; in the other, the expert states the facts and gives his conclusion in the form of an opinion which may be accepted or rejected by the jury.

If the knowledge of the experts consists in descriptive facts which can intelligently be communicated to others not familiar with the subject, the case belongs to the first class.''

The last point is as to the testimony of one Williams, who testified for the plaintiff. This witness was permitted, over the objection of the defendant, to testify that he had, on two different occasions prior to the accident to the plaintiff, slipped and fallen while walking over the approach where the plaintiff received the injuries of which she here complains. It is contended that this testimony was inadmissible, because it brought into the case a collateral issue, a matter *res inter alios acta.* The specific ground of objection was, first, that there was no showing that the defendant or any of its officers or agents knew that Williams had fallen upon the incline, ''or that they had knowledge that the incline was of such a character as might reasonably be expected to lead to the fall of some customer.'' Further objecting, counsel urged that, if the testimony was offered for the purpose of showing that the entrance was inherently unsafe, it was not admissible in the absence of a showing that the circumstances and conditions ''surrounding the falls of Williams'' were the same as those existing at the time the plaintiff fell, and that no such showing was made.

We think the evidence was admissible upon the general proposition that testimony of previous accidents similar to the one in question not only tends to show the dangerous character of the place, but, where the previous accidents have occurred under substantially the same general circumstances of the subsequent accident, tends to disclose the cause of the latter, and, furthermore, tends to bring home to the person maintaining the place where the injury occurred knowledge of the dangerous condition of such place. (*Dyas* v. *Southern Pac. Co.,* 140 Cal. 296, 305, 306, [73 Pac. 972];. *District of Columbia* v. *Armes,* 107 U. S. 519, [27 L. Ed. 618, 2 Sup. Ct. Rep. 840]; *Smith* v. *Seattle,* 33 Wash. 481, [74 Pac. 674]; Wigmore on Evidence, sec. 458; Chamberlayne on Modern Law of Evidence, sec. 3198.)

In the Armes case, a policeman who saw Armes fall on a sidewalk, which was defectively constructed and maintained, was asked, after testifying to the accident, whether, while on his beat, other accidents had happened at that place. The question was objected to on the ground that it tended to in-

troduce collateral issues into the case, but the objection was overruled, and the witness replied that he had witnessed other accidents there. The United States supreme court, replying to the point as thus made with reference to that testimony, said, speaking through Mr. Justice Field: "The admission of this testimony is now urged as error; the point of the objection being that it tended to introduce collateral issues and thus mislead the jury from the matter directly in controversy. Were such the case, the objection would be tenable; but no dispute was made as to these accidents, no question was raised as to the extent of the injuries received; no point was made upon them; no recovery was sought by reason of them; nor any increase of damages. They were proved simply as circumstances which, with other evidence, tended to show the dangerous character of the sidewalk in its unguarded condition. The frequency of accidents at a particular place would seem to be good evidence of its dangerous character; at least, it is some evidence to that effect. Persons are not wont to seek such places, and do not willingly fall into them. Here the character of the place was one of the subjects of inquiry to which attention was called by the nature of the action and the pleadings, and the defendant should have been prepared to show its real character in the face of any proof bearing on that subject. Besides this, as publicity was necessarily given to the accidents, they also tended to show that the dangerous character of the locality was brought to the attention of the city authorities." (See, also, *Quinlon* v. *Utica,* 74 N. Y. 603; *Chicago* v. *Powers,* 42 Ill. 169, [89 Am. Dec. 418].) There are many other cases to the same effect, but the doctrine is too well settled to make further citations herein necessary.

It is in effect contended, however, that, before previous accidents may be shown, it must be made to appear that such previous accidents occurred under circumstances precisely similar to those characterizing the later or subsequent one, and that no such showing was made in this case. We think, though, that the rule is that the previous accidents need only be similar in their general character to the one in question to render proof of them admissible. There is no claim that Williams did not fall upon the approach upon which the plaintiff fell and received her injuries. Nor is there any claim that the approach, as it existed at the time of the acci-

dent to the plaintiff, had not been in the same condition continuously for a long period of time prior and down to the time when the plaintiff fell thereon. Indeed, it appears that Williams was able to identify the approach from a photograph thereof which was taken shortly after the plaintiff was injured and which was exhibited at the trial, and this was some evidence that the general conditions surrounding the approach when he fell thereon on the two occasions referred to by him were substantially the same as they were when the plaintiff received her injuries.

We have now considered all the general propositions upon which a reversal is urged, and, as is manifest from the foregoing discussion, we have discovered in the record no just reason for disturbing the result arrived at below.

The judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 27, 1918, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 27, 1918.